**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | 3:04-CR-76 |
| | ) | |
| **DANIEL M. GROVES, SR.** | ) | |

**MEMORANDUM, OPINION, AND ORDER**

**I.  Procedural Background**

Before this Court is the Motion to Suppress (Docket No. 16) filed by the Defendant, Daniel M. Groves, Sr.  This Court heard oral argument on this motion on October 29, 2004 in South Bend, Indiana.  By written order on November 8, 2004, this Court denied the Defendant's Motion to Suppress.  The Defendant proceeded to a jury trial, which began on November 22, 2004.  The jury returned a verdict of guilty on both counts on November 23, 2004, and on June 10, 2005, the Defendant was sentenced to a term of forty-one months imprisonment to be followed by two years of supervised release.

On June 24, 2005, the Defendant filed a notice of appeal.  The Court of Appeals for the Seventh Circuit reversed in part, affirmed in part, and remanded to this Court for further proceedings.  Specifically, the Seventh Circuit reversed the Defendant's conviction on Count I, the firearm possession charge, because there was insufficient evidence to demonstrate that the firearm traveled in interstate commerce.  Regarding the Defendant's sentence, the Seventh Circuit found that this Court's calculation under the sentencing guidelines, including a four level enhancement based on the finding that the Defendant

used a shotgun to commit the offense of criminal recklessness under Indiana law, was not plain error. Finally, the Seventh Circuit instructed that, on remand, this Court should enter fact-findings in support of its ruling on the motion to suppress and should consider the totality of the circumstances in determine whether Foster's consent was voluntarily given. Because the conviction on Count I was reversed, this Court must also resentence the Defendant. The Defendant's re-sentencing will be addressed in a separate Sentencing Memorandum.

## II. Findings of Fact

On July 5, 2004, Susan Schott and Elton Chavez, residents of the Dismas House, and Lloyd Green were sitting on the porch of the Dismas House, which is located at 521 S. St. Joseph Street in South Bend, Indiana. At approximately 9:45 p.m., after hearing gunshots, Schott, Chavez, and Green called the police and reported that someone across the street was shooting in the direction of the Dismas House. Chavez told the 911 operator that he did not know who the man shooting the gun was but that he guessed that he lived at the house across the street from the Dismas House. Chavez also told the 911 operator that he first thought the shots were fireworks but that he "bent down and looked underneath the tree and sure enough this guy's got a shotgun, cocking it, and he wasn't even aiming it at the sky, he was aiming it over towards our house." 911 Transcript at 1. Chavez later testified that he saw Daniel Groves, Sr. reloading a shotgun and that he recognized Groves as a person he had seen barbecuing and playing music outside of 530 S. St. Joseph Street in the previous months of 2004. Transcript Vol. 1, 22-23. At trial,

Chavez conceded that he could not tell what clothes the shooter was wearing because it was dark outside, but stated that the clothing was black.  After the second shot was fired, Schott, Chavez, and Green ran into the Dismas House.

South Bend police officers responded to the 911 call within approximately three minutes.  The officers spoke with Schott, Chavez, Green, and Groves.  Corporal Taylor asked Groves if he had seen anyone shooting a gun.[1]  Groves told the officers that he did not fire a gun and that only fireworks had been used; Groves stated that he never had a gun.  Groves then denied Cpl. Taylor's request to search his apartment, telling Cpl. Taylor to get a search warrant. Cpl. Taylor testified that Groves was "adamant that we could not go in the apartment." Instead, the officers searched the area around the entrance to Groves' apartment at 530 S. St. Joseph Street and found three spent 20-gauge shotgun casings. Transcript Vol. 1, 25, 36-37, 46.  The officers applied for a warrant to search Groves' apartment at 530 S. St. Joseph Street, Apartment #3, but a federal magistrate denied the application.

On July 21, 2004, Task Force Agent Lucas Battani of the South Bend Police Department, along with Task Force Agent Brian Schroth of the Elkhart Police Department, and Special Agent Craig Edwards of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (collectively, the "Project Disarm agents") returned to Groves' apartment at approximately 1:35 p.m.  Suppression Hearing Transcript at 9.  The officers,

---

[1] At the time, Groves was wearing a white shirt and dark pants.

3

who were wearing plain clothes and who arrived in an unmarked vehicle, knocked on Groves' door.  Ms. Shaunta Foster ("Foster"), Groves' girlfriend, answered the door; Agent Battani asked Foster to step outside and speak to the officers.  Foster agreed, but spoke only with Agent Battani.  *Id.* at 10.  When asked by Agent Battani if she lived at the apartment, Foster initially replied that she did not reside there but occasionally stayed at the apartment.  When asked if there was anyone else in the apartment, Foster replied that her daughter was in the home.  *Id*. at 11.  Agent Battani asked Foster how long she had lived there and "she said that she moved into the apartment somewhere around February 14 or 15 of 2004."  *Id.*  Foster told Agent Battani that her boyfriend, Dan, owned the apartment but that she had full access to the apartment and often cleaned it for Groves.  *Id*. at 11-12.  When Agent Battani asked for Foster's consent to search the apartment, Foster stated that she would like to speak to Groves.  Agent Battani testified that he told Foster that the consent was not between himself and Groves but rather between himself and Foster.  *Id.* at 12.  Agent Battani then walked through the ATF Consent to Search Form line by line with Foster.  Foster then stated that she understood the form, agreed to consent, and signed the form.  *Id*. at 12-13.

As a result of the search, the officers recovered two 20-gauge shotgun shells, a pistol magazine containing five live rounds of .22 caliber ammunition, a bank statement in the defendant's name, and a telephone bill addressed to the residence in Foster's name from a drawer in the Defendant's nightstand.  Foster testified that she had arranged for the telephone to be installed at Groves' residence in her name and that, for several months

4

prior to the search, she paid the telephone bill at 530 S. St. Joseph St., Apt. 3. Suppression Hearing Transcript at 32, 38. Foster also testified that she registered her daughter–a first grader–in school for the Fall 2004 as living at Groves' residence at 530 S. St. Joseph St., Apt. 3. Foster slept at the apartment, kept her clothes and other personal items at the apartment, had keys to the apartment, and regularly cleaned the apartment. *Id*. at 41-42, 49.

### III. Discussion

The questions before this Court are: (A) whether Shaunta Foster has actual and apparent authority to consent to a search of Groves' apartment and (b) whether Shaunta Foster's consent was voluntarily given. The Court will address each of those issues in turn.

A. Shaunta Foster's Actual and Apparent Authority

The Fourth Amendment protects the right of the people to be secure in their persons and property against unreasonable searches and seizures. U.S. Const. Amend. IV. Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment, subject to some exceptions. *Minnesota v. Dickerson,* 508 U.S. 366 (1993); *Katz v. United States*, 389 U.S. 347, 357 (1967). The government bears the burden of establishing by a preponderance of the evidence that a warrantless search falls within one of the exceptions. *United States v. Basinski,* 226 F.3d 829, 833 (7th Cir.2000); *see McDonald v. United States,* 335 U.S. 451, 456 (1948). When the government fails to persuade the court that an exception applies, the evidence seized or otherwise obtained

5

through the search must be suppressed. *Basinski,* 226 at 834.

One common exception "recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 126 S.Ct. 1515 (2006) (citations omitted); *see also Florida v. Jimeno*, 500 U.S. 248, 250-251 (1991) (stating that an exception applies when a person consents to a search, "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so."). "The consent of one who possesses common authority over premises or effects is valid against the absent, non-consenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974). In *Randolph*,[2] the Supreme Court stated, "That person might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent, and the exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant. 126 S.Ct. at 1520 (internal citations omitted). And "where a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents." *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000).

---

[2] *Randolph* was decided by the Supreme Court after the suppression hearing in this case. In fact, *Randolph* was not available when the appellate briefs were filed or when oral argument was heard by the appellate court in this case.

6

Common authority can be established when there is "'mutual use of the property by persons generally having joint access or control for most purposes,'" and "consent to search may be obtained from any person who has common authority over the property." *United States v. Denberg*, 212 F.3d 987, 991 (7th Cir. 2000) (quoting *Matlock* 415 U.S. at 993 n. 7).  "Facts that militate in favor of a finding of actual or apparent authority include but are not limited to: (1) possession of a key to the premises; (2) a person's admission that she lives at the residence in question; (3) possession of a driver's license listing the residence as the driver's legal residence; (4) receiving mail and bills at that residence; (5) keeping clothing at the residence; (6) having one's children reside at that residence; (7) keeping personal belongings such as a diary or a pet at that residence; (8) performing household chores at the home; (9) being on the lease for the premises and/or paying rent; and (10) being allowed into the home when the owner is not present." *United States v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006) (internal citations omitted).

This Court must make a determination regarding what weight, if any, should be given to Shaunta Foster's testimony at the suppression hearing held before this Court. The Court declines to credit Foster's testimony at the suppression hearing with regard to whether she resided with Groves at 530 S. St. Joseph St. in South Bend, Indiana.  Foster's statements with regard to this issue have fluctuated throughout the course of this case, beginning with her statements to the officers on the date of the search as well as at the suppression hearing before this Court.  There is no reason why this Court should credit one of Foster's versions of the events over another one of her versions.  Moreover, Foster

7

was evasive and hostile in her testimony at the suppression hearing.  This Court, then, credits Agent Battani's version of the events of July 21, 2004 over that of Foster.

Foster lied at the suppression hearing when she falsely denied that he phone number at the time of the hearing was, in fact, her phone number.  Suppression Transcript at 22-23, 39-41.  Agent Battani testified that on the morning of the suppression hearing, Foster attempted to sign in as a government witness.  Battani testified that when Foster filled out a witness voucher,[3] she listed the following phone number as her own: (574) 232-2038.  Suppression Transcript at 22.  That form was signed and certified by Foster, and Foster testified at the hearing that she did sign the form.  Battani then testified that he performed a reverse look-up of that phone number.  He stated that when (574) 232-2038 was inputted, the AT&T online directory indicated that it was a telephone listing for Shaunta Foster at 530 S. St. Joseph St. in South Bend, Indiana.[4]  Suppression Transcript at 23.

In contrast, Foster testified that she had lived at 1910 Elwood for the past four months; she stated that prior to this address, she had lived at 1514 South Kemble.  She testified that she had never lived at 530 S. St. Joseph St., Apartment 3.  She testified that she did not receive any bills or routine mail at this address.  Suppression Transcript at 32.  But later in her testimony, Foster stated that she did receive a phone bill at 530 S. St.

---

[3] The witness voucher was admitted at the suppression hearing as government exhibit 6.

[4] The printout of the reverse look-up was admitted as government exhibit 5.

Joseph St. For a phone she had installed in the apartment. Suppression Transcript at 38. She stated that she paid the monthly bill for that telephone line "as a present," presumably for Groves. Suppression Transcript at 38. Foster stated that those bills came to 530 S. St. Joseph St. and that the number for that telephone line was (574) 232-2038, the same number that she listed as her own on the witness voucher. Suppression Transcript at 39. When questioned on this issue, Foster first testified that her phone number is not (574) 232-2038, but rather is (574) 289-0434. Foster then testified that she listed (547) 232-2038 on the witness voucher because she still uses that phone number, that it is "her bill," and that people call that number when they need to reach her. Suppression Transcript at 39. It is reasonable for this Court to find, then, that (574) 232-2038 is Foster's phone number and that it is evidence that she does, in fact, reside at 530 S. St. Joseph St.

This Court also finds that Foster had actual authority over the premises because her daughter was registered for school using that address, because Foster stayed overnight at that address, kept personal belongings and personal hygiene items at that address, and because she had a key and unlimited access to the premises. Foster listed Groves' address as her daughter's residence for the purpose of enrolling her daughter in school in that district. Foster testified that she did not live at that address and was simply "using that address because [she] wanted to get [her] daughter from – out of Harrison because I used to go to Studebaker and it's a better school." Suppression Transcript at 31. If Foster is willing to lie on a school enrollment form, this Court finds that there is no reason to believe that she would not lie to this Court about whether she did, in fact, live with Groves

9

at 530 S. St. Joseph Street.

Foster testified that she was not living at Groves' apartment but that she had been staying a couple of nights over at his house. Suppression Transcript at 32. She testified truthfully that she kept personal items at his house, including but not limited to, nighties, perfume, deodorant, makeup, and marijuana. Suppression Transcript at 41. Further, Foster testified that, on July 21, 2004, she told the officers that she cleaned Groves' apartment and had access to all parts of the apartment because she had a key. Suppression Transcript at 42. These facts weigh in favor of a finding that Foster lived at that residence.

Based on the foregoing, this Court finds that as Groves' live-in girlfriend, Foster had actual and apparent authority over the Defendant's property. She exercised broad and common authority over the premises, as illustrated by the facts that the telephone was registered in her name and paid by Foster, that her daughter was registered for school using the Defendant's address, that Foster kept her personal belongings–including her clothing, mail and bills, and personal effects at this residence, and that Foster regularly cleaned the apartment. As such, this Court finds that Foster was a co-occupant who possessed common authority over the residence as well as the ability to consent to a search of that residence. By allowing Foster to exercise common, actual authority,[5] Groves

---

[5]As an additional matter, this Court finds that Foster had apparent authority over the premises. At the time the agents sought Foster's consent, Foster told them that she lived at the apartment and that she had lived there for approximately five months. Foster also told the agents that her daughter was with her at the apartment.

10

assumed the risk that she might permit government agents access to the apartment. Because they shared authority over the residence, Foster's consent is valid against Groves, even though he was absent and non-consenting. *United States v. Matlock*, 415 U.S. 164, 170 (1974).

The Seventh Circuit has instructed that "although Groves was not physically present at the time the officers sought consent from Foster . . . [*Randolph*] will be relevant on remand." *Groves*, 470 F.3d at 320. The Seventh Circuit expressed concern that "there was some evidence that the officers here may have effectively 'removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection.'" *Groves*, 470 F.3d at 321 (quoting *Randolph*, 126 S.Ct. at 1527). The issue then is whether the officers "procured Groves' absence for the purpose of avoiding an objection." *Groves*, 470 F.3d at 321.

In *Randolph*, the Court held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." 126 S.Ct. at 1528. The Court preserved its holding in *Matlock*, stating:

> we have to admit, we are drawing a fine line; if a potential defendant with self-interest is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

*Randolph*, 126 S.Ct. at 1527.

This case is distinguishable from *Randolph* and more closely in line with the facts in *United States v. DiModica*, 468 F.3d 495 (7th Cir. 2006). Unlike the defendant and his

11

wife in *Randolph*, Groves and his live-in girlfriend, Foster, were "not standing together at the doorway, one consenting to the search while the other refused." *DiModica*, 468 F.3d at 500.  Groves was not physically present at the apartment when the agents obtained the consent of his live-in girlfriend, Foster.  Admittedly, this case is also distinguishable from *DiModica*.  In *DiModica*, the officers never asked DiModica for permission to search his house, and DiModica never told the officers that they could not search his house.  When asked on July 5, 2004 whether the officers could search his apartment, Groves told the officers "no" and that they could obtain a search warrant.  This Court finds, however, that these facts are insufficient to invalidate the consent given by Foster.  Groves' refusal to local police officers to search his apartment came more than two weeks prior to the date on which federal agents approached Foster for her consent to search the premises.

Moreover, the officers in this case took less proactive steps with regard to Groves than did the officers in *DiModica*[6].  The *DiModica* Court reasoned that the "officers did not remove DiModica to avoid his objection; they legally arrested DiModica based on probable cause that he had committed domestic abuse."  *DiModica*, 468 F.3d at 500.  Similar logic applies in this case.  While it is true that the officers knew that Groves worked during the day and would likely not be home at 1:30 p.m., the officers did not take any affirmative steps to remove Groves from the premises prior to approaching Foster.  Groves simply was not home when the officers returned to his house, and even though the

---

[6]In *DiModica*, the Court held that there were differences between that case and *Matlock* but found that the differences were immaterial.

12

officers knew that Groves would likely not be home at that time, they did not procure his absence to avoid his objection. Like the Court in *United States v. Wilburn, Sr.*, this Court finds that "Randolph is a rather narrow holding, and no matter how hard [Groves] wiggles–like the stepsisters trying to squeeze into Cinderella's glass slipper–he can't fit within its embrace." Slip Op. No. 05-4073, 2007 WL 63972 (7th Cir. Jan. 11, 2007). Accordingly, Foster's consent alone was valid and sufficient to permit the officers to legally search the residence.

B. Voluntariness of Shaunta Foster's Consent

In order for Foster's consent to be valid, it must have been freely and voluntarily given. *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992). The Supreme Court has held that consent must be "voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte* 412 U.S. 218, 248-249 (1973). "Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Id.* Several factors militate against voluntariness of consent, including but not limited to, "youth, lack of education, low intelligence, lack of any advice regarding constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as a deprivation of food or sleep." *Bustamonte*, 412 U.S. at 226. S*ee also United States v. LaGrone*, 43 F.3d 332, 334 (7th Cir. 1994). No single factor is dispositive, and the totality

13

of the circumstance must be considered in making a voluntariness determination. *Cellitti*, 387 F.3d at 622.

Again, this Court must make a determination regarding what weight, if any, should be given to Shaunta Foster's testimony at the suppression hearing held before this Court. This Court finds that Foster's testimony to the contrary is not credible and credits Agent Battani's testimony over that of Foster. This Court finds that the agents did not threaten Foster in any way. The agents did not threaten to obtain a search warrant and did not threaten the loss of Foster's child to Child Protective Services. Instead, this Court finds that Foster's consent was voluntary and not the result of a promise, threat, coercion, or force. To be clear, this Court finds that the agents did not engage in <u>any</u> coercion or threats – inappropriate or otherwise – with regard to Foster's child.

The Seventh Circuit stated, "we know nothing about Shaunta Foster's level of education, her intelligence, or her age." 470 F.3d at 322. While it is true that the transcript is devoid of testimony regarding Foster's education and intelligence, there is also no evidence to suggest in any way that Foster is of below average intelligence. As such, this Court is in the best position to make findings on those issues as it witnessed Foster's testimony and examination. This Court finds that Foster is of at least average intelligence. There is no evidence to suggest that she is mentally challenged or mentally disabled. The Seventh Circuit stated that Foster "referred to the ATF agent as 'FTD', for example, and some of her speech is consistent with a lack of education." *Id*. Because Foster mis-spoke or confused the sequence of an acronym with which she may or may not

14

be familiar or the fact that she used improper grammar in other instances is not evidence of a lack of education or ability to comprehend the information presented to Foster by the officers. In today's society, the misuse of grammar is commonplace; to find that a person is of low intelligence on this basis would be improper.

Foster was not interrogated in this case, and any questioning that occurred at her home was not repeated or prolonged in nature. Agent Battani explicitly advised Foster of her rights. She was presented with a written ATF Consent to Search Form, which Agent Battani read to and walked through with Foster line by line prior to obtaining her consent. She was advised of her right to demand that agents obtain a search warrant, her right to consult with an attorney, her right to withdraw her consent, and that the evidence obtained as a result of the search could be used against her. At no time did Foster ask to speak to an attorney; the only person she asked to call was Groves. Groves was not then–and is not now–and attorney. As such, her request to speak to Groves, a non-attorney, does not render her decision to speak to the officers and consent to the search invalid. *See Fare v. Michael C.*, 443 U.S. 707, 719, 725 (1979).

Shaunta Foster was neither in custody nor detained in this case, and physical punishment, such as a deprivation of food or sleep, was not employed. Foster was not badgered by police or asked to consent an exceptional number of times. Suppression Transcript at 13. Further, when the officers arrived on July 21, 2004, they did so in plain clothes and unmarked vehicles. While three officers went to Foster's residence, only one–Agent Battani–spoke with Foster. This Court finds that, based on these facts, there

15

was not an overwhelming police presence. Thus, after considering the totality of the circumstances, this Court finds that the circumstances surrounding Foster's consent demonstrate that it was given freely and voluntarily and that it was not the result of duress or coercion, express or implied.

## IV. Conclusion

For the foregoing reasons, this Court finds: (1) that Foster had express and apparent authority to consent to a search of 530 S. St. Joseph St., Apartment 3; (2) that Foster did consent to a search of that apartment; and (3) that Foster's consent was voluntary and not the result of any form of duress or coercion. Accordingly, this Court denies the Defendant's motion to suppress (Docket No. 16). This Court will resentence Groves on the ammunition count in a separate Sentencing Memorandum.

**SO ORDERED.**

**Dated: January 17, 2007**

                                              **S/ ALLEN SHARP**
                                              **ALLEN SHARP, JUDGE**
                                              **UNITED STATES DISTRICT COURT**